KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
Michael J. Kump (SBN 100983)
  mkump@kwikalaw.com
Jonathan P. Steinsapir (SBN 226281)
  jsteinsapir@kwikalaw.com
Gregory P. Korn (SBN 205306)
  gkorn@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

Attorneys for All Named Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| 2DIE4KOURT, a California corporation, KIMSAPRINCESS INC., a California corporation, KHLOMONEY INC., a California corporation, KOURTNEY KARDASHIAN, an individual, KIM KARDASHIAN WEST, an individual, and KHLOE KARDASHIAN, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> HILLAIR CAPITAL MANAGEMENT LLC, a Delaware Limited Liability Company; HILLAIR CAPITAL INVESTMENTS LP, a Cayman Islands Limited Partnership; and HAVEN BEAUTY INC., a Delaware corporation;  NEAL KAUFMAN, an individual SEAN MCAVOY, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 8:16-CV-01304 JVS (DFMx) <br><br> [Notice of Related Case Filed for Case No. 8:16-CV-01307 JVS (DFMx)] <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:   August 22, 2016 <br> Time:   1:30 p.m. <br> Crtrm:  10C [Ronald Reagan Fed. Bldg.] <br><br> **Compendium of Supporting Declarations and Exhibits; and Proposed Preliminary Injunction Submitted Separately** <br><br> Action Filed:   July 13, 2016 <br> Trial Date:     Not Set |

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

**TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that at 1:30 p.m. on August 22, 2016, or as soon thereafter as the parties may be heard, in Courtroom 10C of the above-entitled Court located at the Ronald Reagan Federal Building and United States Courthouse, 411 West Fourth Street, Santa Ana, California 92701, Plaintiffs 2Die4Kourt, Kimsaprincess Inc., Khlomoney Inc., Kourtney Kardashian, Kim Kardashian West and Khloe Kardashian (collectively, "Plaintiffs" or "the Kardashians") will bring on for hearing their Motion for Preliminary Injunction against Defendants Hillair Capital Management LLC, Hillair Capital Investments, LP, Haven Beauty, Inc., Neal Kaufman, and Sean McAvoy (collectively, "Defendants").

Pursuant to Federal Rule of Civil Procedure 65, Local Rule 65-1, and the Lanham Act of 1946, 15 U.S.C. §§ 1114, 1116, 1125(a), and applicable California law, Plaintiffs will and hereby do move the Court for an Order that during the pendency of this action, Defendants, and each of them, together with their agents, employees, representatives, and all persons and entities acting in concert or participation with them, are and shall be enjoined and restrained until the entry of final judgment in this action, from engaging in, committing or performing, directly or indirectly, any and all of the following acts:

1.      From using, displaying, mentioning, advertising, or promoting the federally-registered trademarks KARDASHIAN BEAUTY, KARDASHIAN, KOURTNEY KARDASHIAN, KIM KARDASHIAN, or KHLOE KARDASHIAN (the "Marks") in connection with any of the following: the manufacture, promotion, advertising or sale of goods and services of any kind;

2.      From operating or promoting any website that uses, displays, mentions, advertises or promotes the Marks, or the names, nicknames, likenesses, or photographic images of Plaintiffs Kourtney Kardashian, Kim Kardashian West, or Khloe Kardashian, in connection with the manufacture, promotion, and/or sale of goods and services of any kind, including without limitation, the website

1    kbeauty.com, and the Instagram, Twitter and Facebook pages for KARDASHIAN
2    BEAUTY, kbeauty, and kbeautyofficial; and

3            3.      From using, displaying, mentioning, advertising or promoting the
4    names, likenesses, photographic images or words of Plaintiffs Kourtney Kardashian,
5    Kim Kardashian West, or Khloe Kardashian in connection with any of the
6    following: the manufacture, promotion, advertising or sale of goods and services of
7    any kind.

8            The Kardashians further respectfully request that no bond be required,
9    because the parties expressly agreed in the License Agreement that no bond would
10   be required for an injunction, and because Defendants clearly have no right to
11   further use the Kardashians' intellectual property, such that the danger of damage
12   from a wrongfully entered injunction is almost non-existent. *Johnson v. Couturier*,
13   572 F.3d 1067, 1086 (9th Cir. 2009) (district courts have discretion to "dispense"
14   with bond requirement in appropriate circumstances.). To the extent any bond is
15   required, we respectfully request it be in an amount no greater than $25,000.

16           No pre-filing conference of counsel is required on a motion for a preliminary
17   injunction. *See* L.R. 7-3. Nevertheless, on July 20, 2016, after the Court had ruled
18   on Haven's *ex parte* application for injunctive relief in the related case, the
19   undersigned sent a letter to opposing counsel explaining the scope of the injunction
20   that would be sought and requesting that Defendants stipulate to such relief, but
21   Defendants declined to do so. As a result, the Kardashians have no choice but to file
22   this Motion for Preliminary Injunction to protect their valuable intellectual property.
23   (Declaration of Michael J. Kump, ¶¶ 21-22, Exs. 21-22.)

24           This Motion is based on this Notice of Motion, the attached Memorandum of
25   Points and Authorities, the accompanying Declarations of Kim Kardashian West,
26   Kourtney Kardashian, Khloe Kardashian, Kris Jenner, Todd Wilson and Michael J.
27   Kump, Esq., and supporting Exhibits attached thereto (submitted together in a single
28   Compendium), the pleadings and other files and records in this action, and on such

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1 | other oral and documentary evidence as may be presented at the hearing on the

2 | Motion.

3 | DATED: July 21, 2016                    Respectfully submitted,

4 |

5 |                                          KINSELLA WEITZMAN ISER
                                             KUMP & ALDISERT LLP
6 |

7 |                                          By:    /s/ *Michael J. Kump*

8 |                                                 Michael J. Kump
                                                    Attorneys for All Named Plaintiffs
9 |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 1

II.   BACKGROUND FACTS ............................................................................ 3

    A.    The Kardashians Have Spent Years Building Name Recognition. ........ 3

    B.    The License Agreement Dated May 9, 2012. ......................................... 4

    C.    Hillair Acquires The License Agreement. .............................................. 5

    D.    The Kardashians Provide Several Notices of Breach and Requests to Cure, and Eventually Terminate The License Agreement. .......................................................................................... 6

    E.    Defendants' Continued Unauthorized Use Of The Kardashians' Trademarks, Images And Personas ........................................................ 8

    F.    The JAMS Arbitration and the Two Lawsuits Filed by Defendants Despite the Arbitration Agreements Between the Parties. ................................................................................................. 9

    G.    This Action Seeking Injunctive Relief Only ........................................ 10

III.  A PRELIMINARY INJUNCTION IS WARRANTED ................................. 10

    A.    The Kardashians Are Likely to Succeed on the Merits. ...................... 11

        1.    The Kardashians Own Valid Trademarks. ................................. 11

        2.    Haven's Use Of the Marks Following Termination of the License Agreement Constitutes Infringement. ........................... 11

        3.    The Kardashians Justifiably Terminated the Agreement. .......... 13

            (a)    Haven's Material Breaches Warranted Termination. ...... 13

            (b)    Haven's Breaches Were Not Excused ............................. 14

        4.    Hillair Is Further Infringing Because Of Its Failure To Obtain The Kardashians' Approval. ......................................... 17

    B.    The Kardashians Are Further Likely To Prevail On Their Claims For Right Of Publicity Violations Under California Law. .................... 19

    C.    The Kardashians Are Likely to Suffer Irreparable Harm. ................... 19

    D.    The Balance of Equities Tip in Favor of the Kardashians. ................... 24

    E.    A Preliminary Injunction is in The Public Interest. ............................. 25

    F.    No Bond Should Be Required As the Parties Expressly Agreed .......... 25

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

i

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Basic Fun, Inc. v. X-Concepts, LLC*
    157 F. Supp. 2d 449 (E.D. Pa. 2001) ............................................................18

*Brookfield Comm's, Inc. v. West Coast Entm't Corp.*
    174 F.3d 1036 (9th Cir. 1999).................................................................11, 12

*Church of Scientology International v. Elmira Mission of Church of Scientology*
    794 F.2d 38 (2d Cir. 1986) ......................................................................12

*CytoSport, Inc. v. Vital Pharm., Inc.*
    617 F. Supp. 2d 1051 (E.D. Cal. 2009)......................................................20

*EIG Glob. Energy Partners, LLC v. TCW Asset Mgmt. Co.*
    2012 WL 5990113 (C.D. Cal. 2012) ..........................................................10

*Hollywood Athletic Club Licensing Corp. v. GHAC-CityWalk*
    938 F. Supp. 612 (C.D. Cal. 1996)................................................11, 13, 20

*Jay Bharat Developers, Inc. v. Minidis*
    167 Cal. App. 4th 437 (2008)..............................................................1, 2, 16

*Johnson v. Couturier*
    572 F.3d 1067 (9th Cir. 2009)....................................................................25

*Maxim Integrated Prods., Inc. v. Quintana*
    654 F. Supp. 2d 1024 (N.D. Cal. 2009) ...............................................19, 20

*Midler v. Ford Motor Company*
    849 F. 2d 460 (9th Cir. 1988) .....................................................................19

*Paisa, Inc. v. N&G Auto, Inc.*
    928 F. Supp. 1009 (C.D. Cal. 1996)......................................................12, 13

*PMS Distrib. Co. v. Huber & Suhner, A.G.*
    863 F.2d 639 (9th Cir. 1988) ......................................................................10

*S & R Corp. v. Jiffy Lube International, Inc.*
    968 F.2d 371 (3d Cir. 1992).................................................................passim

*Sun Microsystems, Inc. v. Microsoft Corp.*
    999 F. Supp. 1301 (N.D. Cal. 1998) ..........................................................18

*Toyo Tire Holdings Of Americas Inc. v. Cont'l Tire N. Am., Inc.*
    609 F.3d 975 (9th Cir. 2010)......................................................................10

*Wetzel's Pretzels, LLC v. Johnson*
    797 F. Supp. 2d 1020 (C.D. Cal. 2011)...........................................12, 13, 25

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Winter v. NRDC, Inc.*
    555 U.S. 7, 20 (2008) ....................................................................................11

**STATE CASES**

*Eastwood v. Superior Court*
    149 Cal. App. 3d 409 (1983) .......................................................................19

*KNB Enterprises v. Matthews*
    78 Cal. App. 4th 362 (2000)........................................................................19

**STATUTES**

15 U.S.C. § 1057....................................................................................................11

Civ. Code § 3344 ...................................................................................................19

**TREATISES**

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    § 25:31 (4th ed. 2011) .................................................................................12

I.        **INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs Kim, Kourtney and Khloe Kardashian and their loan-out corporations (collectively, the "Kardashians"), seek a preliminary injunction against Defendant Haven Beauty, Inc. ("Haven") and its Cayman Island hedge fund owners, Defendants Hillair Capital Management, LLC and Hillair Capital Investments LP (collectively, "Hillair"), and those acting in concert with them, including the individual Defendants Neal Kaufman and Sean McAvoy, to prohibit and enjoin them from using the Kardashians' trademarks, names, likenesses and images in connection with the sale and promotion of cosmetics, or any products or services.

The Kardashians and Haven are parties to a 2012 license agreement ("License Agreement" or "Agreement") under which Haven was granted the right to use the Kardashians' trademarks, names, likenesses, and images in connection with the development and sale of color cosmetic products. That Agreement was recently terminated for several reasons. However, Defendants have refused to stop using the Kardashians' valuable intellectual property.

In a related case, *Haven Beauty, Inc. v. Kardashian, et al.*, Case No. 8:16-cv-01307 JVS (the "Haven Action"), Defendant Haven attempted to jump the gun on this motion by applying *ex parte* for a temporary restraining order ("TRO"), and an order to show cause ("OSC") regarding a preliminary injunction. The Court denied both requests. (*See* Haven Action, Doc. 24 ("TRO Order") at p.1.) Among other things, the Court noted the undisputed fact that Haven and its predecessors have failed to pay royalties owed under the Agreement, and that "failure precludes Haven from enforcing any rights under the License Agreement." *Id.* The Court cited two cases the Kardashians relied upon in their opposition brief: *S & R Corp. v. Jiffy Lube International, Inc.*, 968 F.2d 371 (3d Cir. 1992), and *Jay Bharat Developers, Inc. v. Minidis*, 167 Cal. App. 4th 437 (2008).

Those cases mandate a finding that Defendants are no longer entitled to use the Kardashians' trademarks and other intellectual property. It is black letter law in

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  the licensing context that, even where a licensor is itself allegedly in breach,

2  a licensee cannot stop paying royalties *and* continue to receive the benefits of the

3  license and use the mark. As the Third Circuit explained in the *Jiffy Lube* case, a

4  licensee must continue to pay royalties to preserve their right to use the mark, even

5  if the licensor is allegedly in breach. A licensee who fails to do so "may still have a

6  legitimate claim for damages, but he does not have the right to continue using the

7  trademark as an infringer." *Jiffy Lube*, 968 F.2d at 376-77.

8  Defendants have concededly refused to pay *any* royalties on the pretextual

9  theory that their obligations are excused because the Kardashians allegedly

10  "breached first" (even though they never sent a notice of such breaches until *after*

11  the Kardashians sent their own notice of breach on February 26, 2016). Defendants

12  have also *explicitly repudiated* their obligation to pay royalties in the future. This is

13  the beginning and the end of the analysis of whether the Kardashians are likely to

14  succeed on the merits of their infringement claims against Defendants. The law is

15  clear that: (a) Haven forfeited its license by ceasing to pay royalties; (b) the

16  Agreement became terminable as a result; and (c) the Kardashians therefore

17  properly terminated. *See id.*; *Jay Bharat*, 167 Cal. App. 4th at 443.

18  In addition to a likelihood of success on the merits, all other preliminary

19  injunction factors overwhelmingly favor entry of an appropriate injunction here.

20  Haven's unauthorized uses of the Kardashians' trademarks and personas are causing

21  irreparable harm. Haven's activities have robbed the Kardashians of control over

22  *their own names, images and marks*, and their associated consumer goodwill.

23  Adding to the problem, Haven's principals have *expressly misrepresented to the*

24  *public* that the Kardashians are involved in this unauthorized product line.

25  The harm to the Kardashians far outweighs any harm that Haven will suffer.

26  As the Court explained in its TRO Order: "Any harm in Haven's attempt to proceed

27  with the Fierce product line explained by its failure to secure preapproval for new

28  products under the terms of the Agreement, and counterbalance by the potential

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  harm to the Kardashian parties from the distribution of product in absence of and in

2  the face of express denial of approval." (TRO Order at p.1 (citation omitted).)

3  The public interest in consumers not being misled also favors an injunction.

4      In order to avoid this Motion, after the TRO was denied, the Kardashians

5  requested that Defendants stipulate to a preliminary injunction along the lines

6  requested here, and offered to provide them with ten days to comply with it.

7  (Kump Decl., ¶ 21, Ex. 21.) Defendants refused, saying that they want a second

8  chance at obtaining the relief denied to them in the TRO Order, and intend "to seek

9  preliminary injunctive relief upon a fully noticed motion." (*Id.*, ¶ 22, Ex. 22.)

10  According to Defendants, the Court denied the TRO due to its reliance on

11  "numerous errors of law and fact in [the Kardashians'] TRO opposition brief." (*Id.*)

12  In light of this willful blindness and failure to even consider that Defendants are

13  acting in disregard of the Kardashians' rights, and the continuing harm caused by

14  the brazen infringement of those rights, the Kardashians have no choice but to file

15  this Motion for Preliminary Injunction.

16      For all the reasons stated in these papers, the Kardashians respectfully request

17  that the Court enter their proposed preliminary injunction.

18  II.   **BACKGROUND FACTS**

19      A.   **The Kardashians Have Spent Years Building Name Recognition.**

20      The Kardashians seek injunctive relief to protect the consumer goodwill they

21  have spent the last decade growing and nurturing. The Declaration of Kris Jenner,

22  the Kardashians' manager, as well as the Declarations of Kourtney, Kim and Khloe,

23  demonstrate in detail: (a) the enormous amount of time and effort over the last

24  decade that they have each put into building name recognition and making their

25  many and varied business activities a success; (b) the importance of the family name

26  "Kardashian", their trademarks, and their individual names to their numerous

27  business activities; and (c) the strong bond and trust that exists between Kourtney,

28  Kim and Khloe and their many loyal fans. The impetus for much of this name

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  recognition has been the award winning reality TV series, *Keeping Up With the*
2  *Kardashians*, which is now in its 12th season and is broadcast in over 160 countries,
3  as well as their use of social media to directly communicate with their fans. (*See*
4  Kris Jenner Decl., ¶¶ 3-30; Kourtney Decl., ¶¶ 2-10; Kim Decl., ¶¶ 2-10; Khloe
5  Decl., ¶¶ 2-10.)

6    **B.    The License Agreement Dated May 9, 2012.**

7    In 2012, the Kardashians granted a third party, Boldface, a license to design,
8  manufacture, and distribute cosmetics using "the Kardashian image," defined not
9  just to include likenesses of the Kardashians, but also to include "the trademark
10 'Kardashian' and each Kardashian's name, fame, nickname, initials, autograph,
11 voice, video, film portrayals or performances, photograph … likeness and image or
12 facsimile image, and any other likeness of, or means of endorsement by, each
13 Kardashian." (Wilson Decl., ¶ 6, Ex. 1, ¶ 1(A).) The license to sell product lines
14 under the Agreement, and all uses of the Kardashians' intellectual property, are
15 conditioned on the Kardashians' express approval of such products and the manner
16 in which their images and marks are used. (*Id.*, ¶ 7, Ex. 1, ¶ 7, p. 21.)

17   In consideration for the License Agreement, the Licensee agreed to pay the
18 Kardashians: (a) a non-refundable advance at the outset (*id.*, ¶ 8, Ex. 1, ¶ 5(B));
19 (b) a royalty ranging from 8-10% on wholesale sales (*id.*, Ex. 1, ¶ 5(A)); and
20 (c) "guaranteed minimum royalt[ies]" ("GMRs"), split into several payments to
21 occur at different times during the term of the License Agreement (*id.*). Other than
22 the non-refundable advance paid in 2012, the Kardashians have not been paid
23 *anything* under the Agreement. (*Id.*, ¶ 9.)

24   The License Agreement requires the Kardashians to promote the licensed
25 cosmetics line through photo shoots, personal appearances, and social media.
26 (Wilson Decl., ¶ 10, Ex. 1, ¶ 4.) However, all of these obligations are *expressly*
27 *conditioned* on the Licensee's timely payment of all royalties, along with Licensee's
28 compliance with other requirements in the Agreement. (*Id.*, ¶ 4(C)(vi), p. 12.)

1    The License Agreement entitles the Kardashians to terminate in the event of a

2    material breach, including if the Licensee "fails in any obligation to make timely

3    payments … and any such payment is not received within ten (10) business days

4    after Licensee's receipt of the written notice of such failure," or if it "breaches any

5    other material term of this Agreement, which breach Licensee has failed to cure

6    within thirty (30) days after [its] receipt of the [Kardashians'] written notice of such

7    breach." (Wilson Decl., ¶ 12, Ex. 1, ¶ 11.) Upon termination, the Licensee is

8    prohibited from using the Kardashians' names, trademarks, or images "in any

9    manner whatsoever." (Wilson Decl., ¶ 13, Ex. 1, ¶ 13, p. 27.)

10   **C.      Hillair Acquires The License Agreement.**

11   The initial Licensee, Boldface, released Kardashian-sponsored products under

12   the brand name "Kardashian Beauty." The Kardashians, through their loan-out

13   companies, registered the trademark KARDASHIAN BEAUTY for use in

14   connection with cosmetics. (Wilson Decl., ¶ 14, Ex. 23.)

15   When Boldface ran into financial problems, Hillair agreed to lend it money.

16   (Wilson Decl., ¶ 20.) Hillair eventually sued Boldface as a secured creditor.

17   A receiver was then appointed who auctioned off Boldface's assets. Hillair

18   purchased the assets, including the License Agreement, "as is" (i.e., fully knowing

19   that Boldface was in breach). (*Id.*, ¶¶ 21-22.) Hillair then assigned the Agreement to

20   a Delaware shell company wholly owned by it—Defendant Haven. (*Id.*)

21   For several months, Hillair's principals, together with counsel for the

22   Kardashians, sought to find new investors who could buy out Hillair's interest in

23   Haven (or Haven's interest in the License Agreement). (Wilson Decl., ¶¶ 24-29.)

24   Hillair's principals knew Kardashian Beauty required more working capital than

25   Hillair was prepared to contribute, and knew that the Kardashians were owed

26   substantial sums under the Agreement, and thus hoped to recoup their initial

27   investment and turn a quick profit by "flipping" the assets to a new buyer. (*Id.*)

28   By the end of 2015, it was clear that Haven's prospective investors would not

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

come through. (Wilson Decl., ¶ 29.) Thus, in late 2015 and early 2016, the Kardashians' personal counsel (Todd Wilson) and manager (Kris Jenner) had discussions with Hillair's principals about how Hillair and Haven would fund and operate Kardashian Beauty going forward. (*Id.*, ¶ 30.) The Kardashians' representatives stressed that Hillair and Haven needed to pay monies owed under the Agreement if they were to move forward with the brand. (*Id.*; Jenner Decl., ¶ 26.)

### D.    The Kardashians Provide Several Notices of Breach and Requests to Cure, and Eventually Terminate The License Agreement.

Since the execution of the License Agreement in May 2012, the initial non-refundable advance is the *only payment the Kardashians have ever received*, and notably, that money was paid by the original Licensee, Boldface, not Hillair or Haven. (Wilson Decl., ¶ 9.) Thus, to be clear, despite the substantial royalties that have been owed to the Kardashians for years, neither Hillair nor Haven have ever paid them *a single penny*.

In light of the prior financial problems of Boldface, and then the efforts by the Kardashians and Hillair to find investors to buy out Hillair's interests, the Kardashians did not demand immediate payment of money owed by the Licensees. However, on February 26, 2016, when it became clear that Hillair and Haven had no plans to sufficiently fund the Kardashian Beauty cosmetics brand, the Kardashians served a Notice of Breach and Opportunity to Cure under the Agreement. (Wilson Decl., ¶ 38; Kump Decl., ¶ 2, Ex. 2.) That letter sets forth numerous breaches by Hillair and Haven, including their failure to pay the guaranteed royalties owed under the Agreement and their failure to pay for the Kardashians' attorneys' fees incurred in two litigations arising out of the sale of products under the Agreement. (*Id.*)

The Kardashians gave Hillair and Haven further notice of breaches and need to cure, including in letters dated April 1, 2016 (Wilson Decl., ¶ 40; Kump Decl., ¶ 5, Ex. 5) and June 22, 2016. (*Id.*, ¶¶ 49-50; Kump Decl., ¶ 8, Ex. 8).) The June 22 letter again demanded Hillair and Haven's compliance with the License Agreement

and notified them that the Kardashians would terminate in ten business days unless Hillair and Haven cured their breaches by, among other things, paying all royalties and other monies owed to the Kardashians. (Ex. 8.)

Ten business days from the June 22, 2016 notice of breach amounted to more than two weeks. At no time, however, did Haven or Hillair contact the Kardashians to discuss the notice of breach. (Wilson Decl., ¶ 52.) Rather, at the close of business on July 7, 2016, the final day to cure, Hillair and Haven's counsel sent a letter rejecting the Kardashians' claims of breach. (Wilson Decl., ¶ 54; Kump Decl., ¶ 12, Ex. 12.) Haven repudiated *any* obligation to pay royalties now or in the future, contending that it was excused from doing so by the Kardashians' supposed breaches: "Because your clients are in prior material breach of the License, no royalty payments are due, *nor will any be paid*, unless your clients compensate my client for the considerable damage as a result of your clients' breaches. … Until my client is made whole, any monies due to the Kardashians are properly withheld as an offset to my client's damages." (Ex. 12, p. 2 (emphasis added).)

This July 7 letter did not set out the amount of these supposed "considerable damages," but in Hillair's complaint filed against the Kardashians in state court, they sought damages in excess of $180,000,000. (Kump Decl., ¶ 23, Ex. 38, ¶ 8; *see also* Ex. 3 (letter offering to accept $32 million payment for alleged "damages").) In other words, Hillair and Haven were saying that they would not be paying *any royalties whatsoever* until the Kardashians paid them this nine-figure amount. Hillair and Haven were therefore demanding that the Kardashians allow their intellectual property to be used for free, *without the Kardashians having been paid anything in four years and without any realistic prospect of the Kardashians ever being paid in the future*. The July 7 letter further repudiated *any* obligations to indemnify the Kardashians for the legal fees they had incurred. (Ex. 12, p. 1.)

Accordingly, on July 8, 2016, when the time to cure had expired, the Kardashians sent written notice at 12:08 a.m. PDT terminating the License

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

Agreement, effective immediately. (Wilson Decl., ¶ 55; Kump Decl., ¶ 13, Ex. 13.) The termination letter further demanded that Hillair and Haven immediately stop using the Kardashians' names, trademarks, and images as required by Paragraph 13 of the License Agreement. (*Id.*)

### E.   Defendants' Continued Unauthorized Use Of The Kardashians' Trademarks, Images And Personas

In May 2016—at a time when Haven was refusing to comply with any of its obligations under the License Agreement—Haven sent new product samples to the Kardashians for approval in accordance with Paragraph 7 of the Agreement. The Kardashians' personal counsel, Todd Wilson, made clear in two separate emails that the Kardashians did *not* approve the products, and that they would not approve any products until Haven cured its breaches and paid the substantial sums owed to them under the Agreement. (Wilson Decl., ¶¶ 44-48, Ex. 31.)

Despite this express *disapproval*, the Kardashians learned for the first time on July 7, 2016, that Hillair and Haven Beauty were planning the next day to launch their new "Fierce" line of Kardashian Beauty products. The Kardashians immediately sent a letter demanding that Hillair and Haven cease and desist from these *expressly disapproved* activities. (Wilson Decl., ¶ 53; Kump Decl., ¶ 11, Ex. 11.) Notwithstanding this clear demand, Hillair and Haven, through counsel, stated their intention to forge ahead. (*Id.*, ¶ 54; Kump Decl., ¶ 12, Ex. 12.)

On July 8, 2016—*after* the License Agreement had been terminated—Hillair and Haven launched via the internet and the national press its new "Fierce" line of cosmetic products bearing the Kardashians' trademark, KARDASHIAN BEAUTY, and using the Kardashians' names and images to promote the line. This was the *exact product line* that the Kardashians had *expressly disapproved*. (Wilson Decl., ¶¶ 44-48.) Hillair and Haven promoted the new products through the "official" pages of Kardashian Beauty on Instagram, Facebook and Twitter, in each case using the KARDASHIAN BEAUTY trademark *without authorization*, and using pictures

Kinsella Weitzman Iser Kump & Aldisert llp

808 Wilshire Boulevard, 3ʳᵈ Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1   of the Kardashians and *purported quotes from the Kardashians* in connection with

2   the products *without authorization*. Further, Haven appeared at the "Beautycon"

3   convention in Los Angeles on July 9, 2016 to promote the unauthorized "Fierce"

4   line of cosmetics. (Wilson Decl., ¶¶ 56-60, Exs. 32-24.) None of these activities

5   were approved. (Wilson Decl., ¶ 60; Jenner Decl., ¶¶ 27-28; Kourtney Decl., ¶¶ 7-8;

6   Kim Decl., ¶¶ 7-8; Khloe Decl., ¶¶ 7-8.)

7      The Kardashians also learned that Haven had entered into some type of

8   arrangement with another company to use the Kardashians' names and images in a

9   mobile app called "YouCam Makeup app" that allows users to "virtually" try on the

10  new Fierce products in the app. Not only was this never approved by the

11  Kardashians, Haven *never even told the Kardashians* that they were going to use

12  their names, images and trademarks in a mobile app. (Wilson Decl., ¶¶ 61-65;

13  Jenner Decl., ¶¶ 27-28; Kourtney Decl., ¶¶ 7-8; Kim Decl., ¶¶ 7-8; Khloe Decl., ¶¶

14  7-8.) The rights to use the Kardashians' intellectual property in mobile apps is one

15  of the most valuable categories for the Kardashians (Jenner Decl., ¶¶ 11-19), and *no*

16  *permission was ever given* to Hillair or Haven to effectively sublicense the

17  Kardashians' intellectual property to a mobile app developer.

18      To this day, Haven continues to market and sell products bearing the

19  Kardashians' trademarks, and it continues to use the Kardashians' names and

20  images to promote those products. The Kardashian Beauty website operated by

21  Hillair and Haven (kbeauty.com) is up and running and offering Kardashian Beauty

22  products for sale. (Wilson Decl., ¶ 71.) As Haven admitted in its TRO briefing in the

23  Haven Action, it has accepted sales from retailers for the unauthorized Kardashian

24  Beauty products. (*See* Haven Action, Doc. 8 (Morgan Decl.) ¶ 90.)

25      **F.**    **The JAMS Arbitration and the Two Lawsuits Filed by Defendants**

26           **Despite the Arbitration Agreements Between the Parties.**

27      In March 21, 2016, Hillair filed suit against the Kardashians in the Los

28  Angeles County Superior Court for alleged breaches of the License Agreement

1  (even though Paragraph 27(A) of the License Agreement requires that all claims be

2  mediated and then arbitrated). (Wilson Decl., ¶ 39; Kump Decl., ¶ 23, Ex. 38.)

3  The state court granted the Kardashians' motion to compel arbitration of Hillair's

4  claims and stayed the action. (Wilson Decl., ¶ 43; Kump Decl., ¶ 10, Ex. 10.)

5      On April 11, 2016, the Kardashians commenced a JAMS arbitration against

6  Hillair and Haven for damages from breach of the License Agreement. (Wilson

7  Decl., ¶ 41; Kump Decl., ¶ 6, Ex. 6.) On July 14, 2016, Defendants filed the Haven

8  Action in this Court and immediately sought a TRO and OSC, which the Court

9  denied. All of Haven's claims for damages in the Haven Action should be arbitrated.

10      **G.    This Action Seeking Injunctive Relief Only.**

11      The License Agreement's arbitration clause, paragraph 27(A), expressly

12  provides that "nothing herein shall restrict or limit a Party from seeking or obtaining

13  injunctive relief as provided herein." (Ex. 1, ¶ 27(A).) As shown by Haven's

14  application for a TRO, Haven agrees that paragraph 27(A) preserves the parties'

15  right to seek preliminary injunctive relief from a court. (Haven Action, Doc. 5

16  (*Ex Parte* Notice) at p. 3:2-6.) In light of the foregoing, along with authority in this

17  Circuit permitting such relief pending arbitration[1], the Kardashians on July 13,

18  2016, filed this action which *only* seeks injunctive relief. The Complaint does *not*

19  seek any money damages and does *not* request a jury trial. (Doc. 1.)

20  **III.   A PRELIMINARY INJUNCTION IS WARRANTED**

21      "[A] district court can grant injunctive relief in an arbitrable dispute pending

22  arbitration, provided the prerequisites for injunctive relief are satisfied." *PMS*

23  *Distrib. Co. v. Huber & Suhner, A.G.*, 863 F.2d 639, 641 (9th Cir. 1988) (internal

24

25      [1] *Toyo Tire Holdings Of Americas Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d
26  975, 981 (9th Cir. 2010); *EIG Glob. Energy Partners, LLC v. TCW Asset Mgmt.*
    *Co.*, 2012 WL 5990113, at *2 (C.D. Cal. 2012) (relying on *Toyo Tire* to grant
27  preliminary injunction, and noting further that "[h]ere, the arbitration agreements
    specifically provides that the parties may seek a preliminary injunction …").

28

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800  •  Fax 310.566.9850

quotations and citations omitted). A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). All factors favor the entry of a preliminary injunction here.

### A.     The Kardashians Are Likely to Succeed on the Merits.

To establish a claim for trademark infringement under Sections 32(1) or 43(a) of the Lanham Act, the Kardashians must demonstrate (1) ownership of a valid trademark, and (2) a likelihood of consumer confusion. *Brookfield Comm's, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999). As shown below, the Kardashians are almost certain to prevail on these claims.

#### 1.     The Kardashians Own Valid Trademarks.

A federal trademark registration accords the owner a presumption of ownership of a valid mark. *See* 15 U.S.C. § 1057(b). Thus, on this motion for preliminary injunction, the Kardashians can make "a *prima facie* showing of ownership of  a protectable trademark by producing a certificate of registration." *Hollywood Athletic Club Licensing Corp. v. GHAC-CityWalk*, 938 F. Supp. 612, 614 (C.D. Cal. 1996). As set forth in the Wilson Declaration, the Kardashians own federally registered trademarks for KARDASHIAN BEAUTY, KARDASHIAN, and for each of their individual names in classes relating to the promotion of brands (collectively, the "Marks"). (Wilson Decl., ¶¶ 14-18, Exs. 23-27.) These are the *exact* marks being used without permission by Defendants. These registrations establish the first element of the Kardashians' trademark claims.

#### 2.     Haven's Use Of the Marks Following Termination of the License Agreement Constitutes Infringement.

The Lanham Act prohibits the use of any trademark that is likely to confuse consumers as to the source, origin, sponsorship, or endorsement of a product. "The core element of trademark infringement is the likelihood of confusion, i.e.,

where the similarity of the marks is likely to confuse customers about the source of the products." *Brookfield*, 174 F.3d at 1053.

It cannot be disputed here that Defendants' now-unauthorized use of the Marks is likely to confuse consumers into mistakenly believing these products originate with or are sponsored by the Kardashians. Haven is using the Kardashians' *exact* Marks on the same types of products the Kardashians have previously sponsored, in the same channels of commerce (*e.g.*, the kbeauty.com website, Instagram, Facebook, Twitter). (Wilson Decl., ¶¶ 56-65.) Moreover, Haven is *expressly misrepresenting* the Kardashians' involvement in these products. (Wilson Decl., ¶¶ 66-67, Ex. 36.)

Courts in cases like this have routinely held that it is an infringement *per se* when a former licensee continues using a trademark after the expiration or termination of the license. As stated by another Court in this District:

> Once a franchise, dealership or license contract is terminated, there is no doubt that the former franchisee, dealer or licensee has no authorization or consent to continue use of the mark. After the permission to use the mark has ended, use of the mark must cease …. Continued use by former franchisee, dealer or licensee of the mark constitutes a fraud on the public, since they are led to think that the continuing user is still connected with the trademark owner.

*Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1028 (C.D. Cal. 2011), quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:31 (4th ed. 2011). As held by the Second Circuit, "[a] licensee or franchisee who once possessed authorization to use the trademarks of its licensor or franchisor becomes associated in the public's mind with the trademark holder. When such party, as defendants here, loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer …. [T]he use of a mark by a former licensee confuses and defrauds the public." *Church of Scientology International v. Elmira Mission of Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986).

In *Paisa, Inc. v. N&G Auto, Inc.*, 928 F. Supp. 1009 (C.D. Cal. 1996),

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  plaintiff terminated a trademark license when the defendant stopped paying

2  royalties. *Id.* at 1011. The Court preliminarily enjoined the defendant's continued

3  use of the trademark, reasoning that as a result of the termination of the license,

4  "Defendant is engaging in the unauthorized use of the mark, [and plaintiff] is likely

5  to prevail on its claims for trademark infringement" *Id.* at 1013; *see also Hollywood*

6  *Athletic Club*, 938 F. Supp. at 613-615 (enjoining former licensee's unauthorized

7  use of trademark following termination of the license for failure to pay half of a

8  $100,000 initial fee).

9       Just as in *Wetzel's Pretzels*, *Paisa* and *Hollywood Athletic Club*, the

10  Kardashians terminated the License Agreement because of Haven's uncured

11  breaches of contract. Any use by Haven and Hillair of the Marks thereafter is

12  unauthorized. It is certain to confuse consumers. It is infringing as a matter of law.

13       **3.**     **The Kardashians Justifiably Terminated the Agreement.**

14       Haven took the position in its TRO briefing in the Haven Action that the

15  License Agreement was not properly terminated. That argument has no merit.

16       **(a)**     **Haven's Material Breaches Warranted Termination.**

17       The evidence overwhelmingly shows that the Kardashians validly terminated

18  the License Agreement as a result of Haven's material breaches. Over the last four

19  years, the Kardashians *have not received any monies* under the License Agreement

20  *other than the initial advance* required by Paragraph 5(B) in mid-2012. (Wilson

21  Decl. ¶ 9, Ex. 1.) Each of the substantial GMRs owed under Paragraph 5(A) *have*

22  *not been paid*. (*Id.*) Nor have the Kardashians received the 8-10% royalty on

23  product sales required by Paragraph 5(A). (*Id.*)

24       Haven has also materially breached the Agreement by failing to indemnify the

25  Kardashians as required by Paragraph 14(C) of the License Agreement. (Ex. 1,

26  ¶ 14(C).) Since entering into the License Agreement, the Kardashians have been

27  sued twice arising out of the sale of cosmetic products endorsed by the Kardashians.

28  In the California Action filed in January 2013, Boldface agreed in writing to pay the

1   Kardashians' legal defense costs and did so until encountering financial problems.

2   (Wilson Decl., ¶¶ 31-34.) Haven too agreed that it was obligated to indemnify the

3   Kardashians for the legal fees from the California Action, but attempted to back off

4   that position later. (Kump Decl., ¶¶ 24, 25; Exs. 39, 40.) As a result, the Kardashians

5   are still owed for substantial legal defense costs in the California Action, and Hillair

6   and Haven have refused to indemnify the Kardashians for any of those attorneys'

7   fees. (Kump Decl., ¶ 12; Ex. 12.)

8       In the Florida Action filed in September 2014 during the Boldface

9   receivership proceedings, the Kardashians served a written demand for

10  indemnification on the Licensee at that time, i.e., the receiver. Recognizing this

11  indemnification obligation, Hillair and Haven paid some of the Kardashians'

12  defense costs for about a year, but then stopped when these disputes arose. (Wilson

13  Decl., ¶¶ 35-37.) The Florida Action is still ongoing and the Kardashians are owed

14  substantial legal defense costs (*id.*), which Hillair and Haven also now refuse to pay.

15  (Kump Decl., ¶ 12; Ex. 12.)

16      The consequences of these breaches and failures to cure are clear under

17  Paragraph 11 of the License Agreement. Haven and Hillair had 10 days to make

18  timely payments, which periods ran from the Kardashians' initial February 26, 2016

19  notice of breach, along with their subsequent final notice of breach on June 22,

20  2016. They did not cure and specifically stated they will not do so. (Kump Decl., ¶

21  12; Ex. 12.) There is no question, therefore, that the Kardashians were justified in

22  terminating the License Agreement on July 8, 2016.

23          **(b)**      **Haven's Breaches Were Not Excused.**

24      Defendants also argued in the Haven Action that the Kardashians are in

25  breach of the License Agreement for failing to promote the Kardashian Beauty line,

26  that these breaches excused Haven's obligations (*e.g.*, to pay royalties), and that the

27  Kardashians' termination of the License Agreement is therefore ineffective.

28  That argument fails as a matter of law.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

As a preliminary matter, Haven's argument defies the clear provisions of the License Agreement. The Kardashians' performance is not a condition precedent of Haven's payment obligations. The *opposite* is true. *All* of the Kardashians' obligations in Paragraph 4 to promote the Kardashian Beauty brand are *expressly conditioned* on Haven having paid all royalties owed and otherwise being in compliance with the Agreement. (Wilson Decl.,¶ 10, Ex. 1, ¶ 4(C)(vi).) Thus, Haven could not withhold payments until the Kardashians provide services. Haven has to *first* pay the monies it owes—as well as cure all other breaches—*before* the Kardashians are required to do anything.

Moreover, established case law in the trademark licensing context categorically rejects the precise argument Haven asserts. The law is settled that when a trademark licensee stops paying royalties under a belief that its performance was excused by the licensor's breaches, such cessation of performance renders the license agreement terminable *per se*.

In *Jiffy Lube*, the Third Circuit stressed that a licensee cannot use the licensor's alleged breaches as an excuse to *both* stop paying royalties *and* continue using the trademark. There, the licensee (Durst) "stopped paying royalties to Jiffy Lube … but [ ] continued to operate the three service centers under the Jiffy Lube name." *Jiffy Lube*, 968 F.2d at 373. Jiffy Lube terminated the franchise/license agreement with Durst and sought to enjoin his continued use of its trademark. *Id.* at 373-74. Durst opposed a preliminary injunction, "contend[ing] that he was justified in halting payments because Jiffy Lube breached some of its contractual obligations under the franchise agreement." *Id.* at 374. The Third Circuit disagreed and enjoined Durst's further use of the mark.

*Jiffy Lube* cites several cases addressing the same issue, quoting from one such District Court opinion which eloquently describes the law applicable where the licensors of the BURGER KING trademark had sought to stop paying royalties but continued using the mark:

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800  •  Fax 310.566.9850

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1    When one party to a contract materially breaches his duties under the
2    contract, the other party may proceed in one of two ways. He can either
     consider the contract terminated and sue for damages, or he can
3    continue his performance and sue for partial breach. As Defendants
     have ceased paying the amounts due under the franchise and lease
4    agreement, they seem to have chosen the first option of considering
     [the] breach a total breach. Thus, Defendants themselves appear to have
5    terminated their contractual relationship …. Although Defendants may
     prevail on their breach of contract claims … the Court cannot see how
6    this separate cause of action entitles them to continued rights under the
     franchise agreement. *In order to have preserved their right to recover*
7    *for the alleged breaches and to continue to use the [Plaintiff's]*
     *trademark, Defendants should have continued to pay royalties,*
8    *advertising expenses and rent.*

9    *Id.* at 376, quoting *Burger King v. Austin*, Bus. Fran. Guide (CCH) ¶ 9788 at 22,069

10   (S.D. Fla. 1990) (emphasis in original). Relying on the *Austin* case and others that

11   reached the same result, the Third Circuit in *Jiffy Lube* held that Durst had "done

12   exactly what contract law forbids." *Id.* at 377. "Feeling that Jiffy Lube had violated

13   its duty to him, Durst stopped making royalty payments, but he continued to operate

14   the service centers under the Jiffy Lube name." *Id.* But Durst could not have it both

15   ways: his failure to pay royalties allowed Jiffy Lube to terminate the license

16   *regardless* of whether Jiffy Lube had also breached the agreement. *Id.* The Third

17   Circuit concluded that, having ceased paying royalties, "Durst may still have a

18   legitimate claim for damages, but he does not have the right to continue using the

19   trademark as an infringer." *Id*.

20       Relying upon *Jiffy Lube*, the California Court of Appeal reached the same

21   holding in *Jay Bharat Developers, Inc. v. Minidis*, 167 Cal. App. 4th 437 (2008),

22   where a franchisor (Red Brick Pizza) licensed its mark to a franchisee (Jay Bharat).

23   *Id.* at 440. The licensee was "in breach of the [license agreement] by failing to pay

24   royalties and advertising fees." *Id.* at 441. After providing opportunities to cure, Red

25   Brick Pizza terminated the license. *Id.* Red Brick Pizza sought a preliminary

26   injunction to stop Jay Bharat from continuing to use the RED BRICK PIZZA mark

27   and continuing to profit therefrom. *Id.* at 441-42. Jay Bharat opposed the motion on

28   the basis that it was excused it from paying royalties due to the alleged fraud and

16

1  unclean hands of Red Brick Pizza. *Id.* at 442. The California Court of Appeal

2  disagreed and held the defendant was properly enjoined from using the mark:

> Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. Under no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits.

7  *Id.* at 443, quoting *Jiffy Lube*, 968 F.2d at 376 (emphasis in original). Accordingly,

8  whether or not it had claims against its licensor, Jay Bharat's withholding of

9  royalties warranted termination of the license:

> [A]ppellants breached the [license] by failing to make royalty payments and failing to pay advertising fees. Despite their breaches, appellants still wanted to use the Red Brick Pizza franchise and trademarks. They cannot do so. Once appellants breached the [license], respondents could terminate the franchise agreement and prevent appellants from utilizing the Red Brick Pizza franchise.

14  *Id.* at 444. This would be true even if Jay Bharat had viable fraud claims, because

15  those fraud claims "were relevant to appellants' damages claims, but not to the

16  question of whether an injunction was an appropriate remedy." *Id.* at 445.

17      As established by these cases, Haven's argument and its entire course of

18  conduct since July 8, 2016 is simply wrong. Even if the Kardashians had

19  breached—and they did not—Haven could *not* stop paying royalties *and* continue to

20  claim the benefits of the Agreement. That is *exactly* what Haven has done and said it

21  will continue to do for the foreseeable future. (Kump Decl.,¶ 12; Ex. 12.) Because of

22  this, the Kardashians were entitled to and did validly terminate the Agreement.

### 4.    Hillair Is Further Infringing Because Of Its Failure To Obtain The Kardashians' Approval.

25      Even had the License Agreement not been validly terminated (which it was),

26  Hillair's and Haven's use of the Marks would *still* be unauthorized and infringing

27  because they failed to comply with the approval provisions in Paragraph 7.

28      The grant of rights in Paragraph 3 is "subject to the limitations and conditions

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800  •  Fax 310.566.9850

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800  •  Fax 310.566.9850

1  contained" in the Agreement, including Paragraph 7, which provides that "no use of
2  the Kardashian Image or any item used in connection therewith, and any other
3  means of endorsement by the Kardashians will be made hereunder without the
4  written approval of [the Kardashians] prior to any public release." (Ex. 1, ¶ 3(A),
5  ¶ 7.) At least twice, in writing on May 12 and May 27, 2016, the Kardashians
6  informed Haven and Hillair that its new line of products was expressly *not* approved
7  for use with the Kardashians' trademarks, names, likeness and images. (Wilson
8  Decl., ¶¶ 44-48; Ex. 31.) Hillair and Haven nevertheless disregarded these express
9  disapprovals and launched their new product line anyway. (*Id.*, ¶¶ 56-67.)

10        Because the License Agreement's grant of rights is conditioned on Hillair
11  obtaining the Kardashians' approval, which it did not do, Hillair's use of the Marks
12  is unauthorized and infringing. *See Sun Microsystems, Inc. v. Microsoft Corp.*, 999
13  F. Supp. 1301, 1308-1311 (N.D. Cal. 1998) (preliminary injunction where licensee's
14  use of "JAVA Compatible" trademark on a product was unauthorized under license
15  because product did not pass tests that were a condition of the license to the mark).

16        The decision in *Basic Fun, Inc. v. X-Concepts, LLC*, 157 F. Supp. 2d 449
17  (E.D. Pa. 2001) is directly on point. There, a license of the ALIEN WORKSHOP
18  trademark from the licensor (Alien) to the licensee (Trinity) was "conditioned upon
19  Trinity obtaining Alien's written approval of the final package and product and the
20  use of its logo on the package and product." *Id.* at 452. When Trinity used the mark
21  without first obtaining approval, Alien asserted claims for trademark and copyright
22  infringement. The District Court granted a preliminary injunction, finding that
23  Trinity's product was not licensed because it never obtained the licensor's approval
24  as the agreement required: "Failure to obtain written authorization when required in
25  a license is, as a matter of law, a material breach *and voids the license*." *Id.* at 455
26  (emphasis added). When a "license requires written approval before use, the
27  licensee's failure to obtain written approval means the licensee has exceeded the
28  license and is guilty of trademark or copyright infringement." *Id.* at 456.

Kinsella Weitzman Iser Kump & Aldisert llp

808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

**B.    The Kardashians Are Further Likely To Prevail On Their Claims For Right Of Publicity Violations Under California Law.**

California common law and statutes protect the rights of individuals to exploit their name, identity, and likeness for commercial gain. *See* Civ. Code § 3344(a). *KNB Enterprises v. Matthews*, 78 Cal. App. 4th 362, 366 (2000); *Eastwood v. Superior Court*, 149 Cal. App. 3d 409 (1983); *Midler v. Ford Motor Company*, 849 F. 2d 460, 462 (9th Cir. 1988). The elements of a right to publicity claim are: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercial or otherwise; (3) lack of consent; and (4) resulting injury." *Eastwood*, 149 Cal. App. 3d at 417. For the same reasons described above, Hillair and Haven do not have the Kardashians' consent to use their names, likenesses and images in connection with Kardashian Beauty products going forward: the License Agreement was terminated; and even if it had not been terminated, the Kardashians disapprove the new product line. Accordingly, Hillair is violating the Kardashians' rights of publicity.

**C.    The Kardashians Are Likely to Suffer Irreparable Harm.**

The License Agreement recognizes that "a breach of any of the covenants and agreements contained herein regarding the licensing or use of the Kardashian Image will cause irrpearable harm." (Ex. 1, ¶ 27(B), p. 36.) The Agreement thus expressly authorizes the Kardashians to seek injunctive relief to prevent the use of their names, trademarks, and images, including "after the termination or expiration of the term [of the Agreement]," and to do so "without being required to give any notice, to show actual damages, or to post any bond or other security." *Id.*

Separate and apart from these explicit provisions, there is no question that Hillair's and Haven's unauthorized uses of the Kardashians' trademarks, names, likenesses and images are likely to cause irreparable harm. "In trademark cases, irreparable harm is typically found in a plaintiff's loss of control over their business reputation, loss of trade and loss of goodwill." *Maxim Integrated Prods., Inc. v.*

19

*Quintana*, 654 F. Supp. 2d 1024, 1035 (N.D. Cal. 2009). "Irreparable injury exists where a court reasonably concludes that continuing infringement will result in loss of control over the plaintiff's reputation and goodwill." *Id.* at 1035-36. As one District Court held:

> Trademarks serve as the identity of their owners and in them resides the reputation and goodwill of their owners. Thus, if another person infringes the marks, that person borrows the owner's reputation, whose quality no longer lies within the owner's control. [Citation omitted.] A trademark owner's loss of the ability to control its marks, thus, creates the potential for damage to its reputation.

*CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009).

The risk of irreparable harm is particularly acute in the context of infringement by a former licensee. "In a licensor/licensee case, the reasons for issuing a preliminary injunction for trademark infringement are even more compelling than in the ordinary case." *Hollywood Athletic Club*, 938 F. Supp. at 615. "The licensor has a strong need to control the use of its mark both to preserve the quality of the mark and to maintain the rights to the mark ." *Id.* A licensor thus "need only show that it has lost control over its reputation, which is the very thing that constitutes irreparable harm in the licensing context." *Id.* (internal quotations and citation omitted).

The evidence here overwhelmingly supports a finding of irreparable harm. The Declarations of Kourtney, Kim and Khloe, and their manager Kris Jenner, establish: (a) the importance of the family name "Kardashian," associated trademarks, and their individual names to their numerous business activities; (b) the enormous amount of time and effort over the last decade that each of them have put into building name recognition and making their many and varied business activities a success; and (c) the strong bond and trust that exists between Kourtney, Kim and Khloe and their many loyal fans. (Kourtney Decl., ¶¶ 2-10; Kim Decl., ¶¶ 2-10; Khloe Decl., ¶¶ 2-10; Jenner Decl., ¶¶ 3-30.)

From early in their careers, the Kardashians and their manager have been very

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

focused on the power of social media as a way to reach new fans and strengthen the ties with existing fans. (Kris Jenner Decl., ¶¶ 11-16.) Social media, such as Facebook, Twitter and Instagram, allows the Kardashians to have direct and immediate contact with their fans. (*Id*.) As a result of all the efforts over the years, they have built strong and loyal followings on all social media platforms. For example, it is reported that on Instagram, Kim has around 77.5 million followers, Khloe has around 52 million and Kourtney has about 43.6 million. (*Id*., ¶ 14.) They also have large number of fans on Twitter (*id*., ¶ 15) and Facebook (*id*., 16.)

They also recognize that new technology is of critical importance to improving the ability of their fans to interact directly with them in new and unique ways. (Jenner Decl., ¶ 11.) In the past few years, the Kardashians have utilized technologies at the forefront of social media, and their success in doing so is well established. (*Id*., ¶¶ 17-19.) These commercial endeavors are tied directly to the "Kardashian" name and image. But the continued success of these commercial ventures depends *on the ability of the Kardashians to control the use of their trademarks, names, likenesses and images*. (Kourtney Decl., ¶¶ 5, 9-10; Kim Decl., ¶¶ 5, 9-10; Khloe Decl., ¶¶ 5, 9-10; Jenner Decl., ¶¶ 25-30; Todd Wilson, ¶¶ 68-74.)

Hillair and Haven's actions in selling and promoting products bearing the Kardashians' trademarks, names, likenesses and images—without their approval and after they have expressly terminated the right to do so—robs the Kardashians of the valuable right to control *their own names*, images, and reputation. Particularly given the fame of the "Kardashian" name and the fact that KARDASHIAN BEAUTY products were *previously* sponsored and approved by the Kardashians, the consuming public is certain to identify Hillair's products as originating with the Kardashians. Indeed, reporting on the new line of Kardashian Beauty cosmetics mistakenly concludes—as would anyone—that the products are endorsed by the Kardashians. (Wilson Decl., ¶ 67, Exs. 33, 36 (article about new, unauthorized Haven products: "Against all odds, the Kardashians have stuck around and so has

Kinsella Weitzman Iser Kump & Aldisert LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

their cosmetics brand"; and including statements by a Haven representative that new products "reflect where the Kardashian family is … The family is involved. … They are aware of what we are doing").)

The Kardashians' fan base has, until now, understood that the use of their trademarks, names, likenesses and images means that the Kardashians stand behind those products. (Kourtney Decl., ¶¶ 5, 9; Kim Decl., ¶¶ 5, 9; Khloe Decl., ¶¶ 5, 9.) It is certain that fans will learn from public reporting of this litigation that the Kardashians do not support Haven's Kardashian Beauty cosmetics products. Thus, fans will be confused—they will know that some Kardashian products might *not* actually be endorsed by them. That will cause the Kardashians' name and marks to lose value. In particular, given that the Kardashians do license the KARDASHIAN BEAUTY trademark in another class, hair care, (Jenner Decl., ¶ 21), fans will likely be confused that these *legitimately licensed products* are *not* legitimate. Measuring and quantifying these damages in a later proceeding will be extremely difficult.

The harm to the Kardashians is exacerbated by Hillair and Haven's mismanagement of the KARDASHIAN BEAUTY brand, which is occurring outside the Kardashians' control. Haven initially promoted its new line of Kardashian Beauty products under the product name "Fierce." (Wilson Decl., ¶ 56.) News reports about the new Kardashian Beauty line referred to it as the "Fierce" collection. (*Id.*, ¶¶ 57-59; Exs. 32-34.) However, almost immediately after the launch, the Kardashians received a cease and desist letter from Abercrombie & Fitch Trading Co. ("A&F") threatening suit against them for infringement of A&F's registered FIERCE trademarks. (*Id.*, ¶¶ 68-72; Ex. 37.) Haven has thus exposed the Kardashians to further risk of litigation. Moreover, while Haven may have ameliorated that risk somewhat when it recently agreed in writing to cease using the "Fierce" brand name (Wilson Decl., ¶¶ 69-70; Kump Decl., ¶¶ 19-20, Exs. 19-20), this entire, avoidable series of missteps is damaging to the Kardashians and the KARDASHIAN BEAUTY brand. (Wilson Decl., ¶¶ 72-74.)

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    Haven has also purported to authorize the use of the Kardashians' names and

2    images in a mobile app called "YouCam Makeup" that allows users to "virtually"

3    try on the new Kardashian Beauty products in the app. Not only was this *never*

4    approved by the Kardashians, Haven *never even told the Kardashians* that they were

5    going to use their names, images and trademarks in a mobile app. (Wilson Decl.,

6    ¶¶ 61-65; Jenner Decl., ¶¶ 27-28; Kourtney Decl., ¶¶ 7-8; Kim Decl., ¶¶ 7-8; Khloe

7    Decl., ¶¶ 7-8.) The rights to use the Kardashians' intellectual property in mobile

8    apps is one of the most valuable categories for the Kardashians (Jenner Decl., ¶¶ 11-

9    19), and *no permission was ever given* to Hillair or Haven to effectively sublicense

10   the Kardashians' intellectual property to a mobile app developer. (Wilson Decl.,

11   ¶¶ 63-65; Kourtney Decl., ¶¶ 7-8; Kim Decl., ¶¶ 7-8; Khloe Decl., ¶¶ 7-8.)

12   Among other reasons, the Kardashians insist that licensees get their permission

13   before using their names, marks and images to make sure that the licensee is staying

14   within the bounds of the license, and not getting into other areas where another party

15   has been licensed rights. (Wilson Decl., ¶ 73.) Without a Court order stopping

16   Defendants, they will continue to act without the Kardashians' approval, and will

17   likely continue to purport to sublicense the Kardashians' names, images, and marks

18   to other parties in non-licensed categories (such as mobile apps), which could cause

19   the Kardashians to be in violation of commitments to third parties.

20   In short, Hillair's and Haven's cavalier infringements have made the

21   Kardashians the unwilling spokespersons for a product line that they do not control,

22   influence, approve of, or endorse. The Kardashians have no control or say over the

23   quality of the products bearing their name, nor the branding, packaging, or

24   promotion of the products. As a result, the goodwill associated with their name is

25   now at the mercy of Haven and Hillair—companies who in recent months have

26   demonstrated a total lack of respect for the Kardashians, and their ability to control

27   their own goodwill, images, and names. Particularly given the critical role that

28   product endorsements play in the Kardashians' business affairs, the risk of

1   irreparable harm is far more palpable than in the cases cited above and many others

2   where courts have easily found a likelihood of irreparable harm.

3       **D.**    **The Balance of Equities Tip in Favor of the Kardashians.**

4       The balance of the equities tip sharply in the Kardashians' favor. Haven is *per*

5   *se* infringing the Kardashians' trademarks and rights of publicity by using their

6   names, trademarks, and images after termination of the License Agreement. *See* pp.

7   11-13 *supra*. As described in the accompanying Declarations, it is critical to the

8   Kardashians that they oversee the use of their names and trademarks on products.

9   (Kourtney Decl., ¶ 5; Kim Decl., ¶ 5; Khloe Decl., ¶ 5.) The Kardashians absolutely

10  do not support or endorse Haven's new line of products. (*Id.*, ¶ 8.) Haven's

11  continued use of their names and trademarks in spite of that fact divests the

12  Kardashians of their right to control the valuable goodwill in their names, and

13  effectively forces them to have their names and images associated with products

14  they want nothing to do with. (*Id.* ¶ 10.)

15      Haven will argue that the balance of equities favor it, because of the damage

16  that will be done to its business if it is enjoined from selling product and otherwise

17  using the Kardashians' names and images. The "harm" is truly a product of

18  Defendants' own making. The Kardashians provided *months* of notice that they

19  would terminate the License Agreement if Haven did not cure. Instead of complying

20  with the Agreement, Haven repudiated its obligations and it proceeded with a new

21  product line that the Kardashians specifically *disapproved*. Frankly, if the immense

22  harm Haven says will befall it is true, its failure to pay the Kardashians what they

23  were owed—*or even to attempt to work out a resolution with the Kardashians*—was

24  completely reckless and simply inexplicable. Over the last several months, the

25  Kardahians' representatives have *repeatedly* attempted to negotiate a fair resolution

26  of the parties' issues, *but Defendants have essentially refused to talk to them at all*.

27  (Wilson Decl., ¶ 42.) The equities do not favor Haven because it will be enjoined

28  from selling products that it has no right to sell and should never have launched.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

### E.    A Preliminary Injunction is in The Public Interest.

Courts and commentators have repeatedly stated that a former licensee's use of a mark following termination of the license "constitutes a fraud on the public, since they are led to think that the continuing user is still connected with the trademark owner." *Wetzel's*, 797 F. Supp. 2d at 1028. Haven is expressly misrepresenting to the public that the KARDASHIAN BEAUTY products have the approval and endorsement of the Kardashians, when Haven *knows* that this is false and a "fraud on the public." (Wilson Decl., ¶¶ 66-67; Ex. 36.) The public has an obvious and important interest is in the dissemination of *truthful information*.

### F.    No Bond Should Be Required As the Parties Expressly Agreed.

District courts have discretion to "dispense" with the bond requirement in appropriate circumstances. *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). Here, the parties expressly agreed in paragraph 27(B) that injunctive relief could issue without "post[ing] any bond or other security." (Ex. 1, ¶ 27(B).) Indeed, Defendants specifically asked the Court in the Haven Action to issue an *ex parte* TRO without the posting of bond *because of this contractual provision*. (Haven Action, Doc. 5 (*Ex Parte* Notice) at 3:2-6.) Defendants are therefore estopped from denying the validity of this provision—they cannot seek to invoke the benefit of the provision, but then run away from it when it is used against them. If the Court, however, is inclined to require a bond, the Kardashians request that it not be greater than $25,000 given that the potential of a wrongfully entered injunction is extremely small here given the facts.

DATED: July 21, 2016                    KINSELLA WEITZMAN ISER
                                        KUMP & ALDISERT LLP


                                        By:  _____ /s/ *Michael J. Kump* _____
                                             Michael J. Kump
                                             Attorneys for All Named Plaintiffs

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850